**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KIM L. SAUTER, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 08-899 (WHW) |
| | : | |
| FEDERAL HOME LOAN BANK OF NEW YORK, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Walls, Senior District Judge**

Defendant has filed a motion to dismiss, or in the alternative, for summary judgment. Plaintiff subsequently filed a cross-motion for summary judgment. The Court will treat defendant's initial motion as one for summary judgment. The central issue before the Court is the validity of a release signed by a plaintiff after her termination of employment with the defendant.

**FACTS AND PROCEDURAL BACKGROUND**

The following facts are uncontested by the parties:

Plaintiff Kim L. Sauter worked as a Residential Loan Review Analyst for defendant Federal Home Loan Bank of New York (FHLBNY) from November 22, 2004 to March 20, 2007. (Pl.'s Compl. ¶¶ 1-2, 6.) Prior to her termination, Sauter had been approved for FMLA-protected leave for March 21, 2007 so that she could have an embellization procedure performed on March 27, 2007. (Id. ¶ 34.)

1

**NOT FOR PUBLICATION**

On March 20, 2007, Edwin Artuz, defendant's Director of Human Resources, and Wendy Ianonne, defendant's immediate supervisor, met with Sauter to explain to her that she was being terminated as of that date.  (Artuz Decl. ¶ 9; Sauter Decl. ¶ 25.)  After Ianonne left the room, Artuz spent an additional ninety minutes with Sauter, clarifying the reasons for her termination. (Artuz Decl. ¶ 10.)  At this meeting, Artuz provided Sauter with a three-page Severance Release and Letter Agreement ("Release").  (Id. ¶ 11; Sauter Decl. ¶ 26.)  The Release explained that if Sauter executed the Release, she would be provided with four weeks of severance benefits. (Artuz Decl. Ex. A.)  It further stated that if she was a participant in the FHLBNY's Employee Medical Benefits Plan ("Medical Plan") at the date of termination, her medical, vision, and dental benefits under the Medical Plan would terminate as of that date.  (Id.)  However, it notified Sauter that she might choose the option, as provided under COBRA, of continuing her medical, vision, and dental benefits under the Medical Plan.  (Id.)  On the second page, under the underlined heading of "Release," the Release read:

> Your acceptance of the aforementioned severance benefits shall constitute your agreement to irrevocably and unconditionally release the FHLBNY, as well as its present and former directors, officers and employees, jointly and individually, from any and all claims, known or unknown, arising out of, or regarding, your employment with the FHLBNY, or termination thereof, or compensation from the FHLBNY, including, but not limited to, claims pertaining to the Age Discrimination in Employment Act.

(Id.)  Finally, the Release stated that if Sauter wished to accept the severance package, she must sign and return the agreement by no later than 5:00 p.m. on April 11, 2007, a fully twenty-one days after Sauter was presented with the Release; it further allowed Sauter to revoke her acceptance within seven days.  (Id.)  The specific facts as to what was discussed in Sauter's

2

**NOT FOR PUBLICATION**

meeting with Artuz as well as her understanding of the Release are in dispute and will be analyzed in the Court's discussion.

Sauter took the Release home, read, signed and returned it to the FHLBNY via FedEx overnight drop-off on March 20, 2007.  (Sauter Decl. ¶ 28, 30.)  She never sought to revoke her acceptance thereafter.  (Def.'s Br., 3.)  As part of the agreement, Sauter received four weeks of severance pay in the gross total amount of $5,465.64, and reimbursement of $669.15 for the premium associated with one month of continuation of health insurance under COBRA; she never returned these severance benefits.  (Artuz Suppl. Decl. ¶¶ 5, 9; Artuz Decl. Ex. A.)

On February 17, 2008, Sauter filed a complaint against the FHLBNY, alleging violations of Title VII of the Civil Rights Act ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act ("FMLA").  (Pl.'s Compl. ¶¶ 38, 42, 47, 51, 54, 57.)  On May 22, 2008, the FHLBNY filed a motion to dismiss the complaint, or in the alternative, for summary judgment, arguing that Sauter's claims were barred by the Release.  (Def.'s Br.)  Sauter subsequently filed a cross-motion for partial summary judgment on June 20, 2008.  (Pl.'s Br.)  On July 8, 2008, the FHLBNY filed a reply brief to Sauter's cross-motion for partial summary.  (Def.'s Reply Br.)

**STANDARD OF REVIEW**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).  The question is whether the

NOT FOR PUBLICATION

claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

Since the parties have asked the Court to look to matters outside the pleadings, pursuant to Fed. R. Civ. P. 12(d), the Court will treat defendant FHLBNY's initial motion to dismiss as one for summary judgment under Fed. R. Civ. P. 56. The Court will consider both parties' motions for summary judgment because the parties have had a reasonable opportunity to and have in fact briefed the cross-motions for summary judgment.

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence

4

NOT FOR PUBLICATION

in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing

party must set forth specific facts showing a genuine issue for trial and may not rest upon the

mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir.

2001).  At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and

inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271,

277 (3d Cir. 2002).

## DISCUSSION

### A.  Whether the Release is Enforceable

Employees may waive employment claims against their employers so long as the waiver

is made "knowingly and willfully."  See Cuchara v. Gai-Tronics Corp., 129 F. App'x. 728, 730

(3d Cir. 2005) (citing Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir. 1988)).  To

determine whether a release is valid, the Third Circuit directs courts to consider the totality of

circumstances surrounding its execution.  See id. at 731 (citing Coventry, 856 F.2d at 523).  To

do so, district courts should consider the following non-exhaustive factors:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and
> business experience; (3) the amount of time plaintiff had for deliberation of the
> release before signing it; (4) whether plaintiff knew or should have known her rights
> upon execution of the release before signing it; (5) whether plaintiff was encouraged
> to seek, or in fact received benefit of counsel; (6) whether there was opportunity for
> negotiation of the terms of the release; and (7) whether the consideration given in
> exchange for the waiver and accepted by the employee exceeds the benefits to which
> she was already entitled to by law.

5

NOT FOR PUBLICATION

Cirillo v. Arco Chemical Co., 862 F.2d 448, 451 (3d Cir. 1988) (citing Coventry, 856 F.2d at

523).  Courts may also consider "whether there is evidence [that the employer procured the

release through] fraud or undue influence, or whether enforcement of the agreement  would be

against the public interest."  See W.B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995).  After

consideration of these factors, the Court concludes that Sauter knowingly and voluntarily

executed the Release.  Accordingly, her Title VII, ADA, and FMLA claims are barred and

dismissed.

    *1.  Clarity and Specificity of the Release Language*

    The Release reads, in relevant part:

> Your acceptance of the aforementioned severance benefits shall constitute your
> agreement to irrevocably and unconditionally release the FHLBNY . . . from any and
> all claims, known or unknown, arising out of, or regarding, your employment with
> the FHLBNY, or termination thereof, or compensation from the FHLBNY,
> including, but not limited to, claims pertaining to the Age Discrimination in
> Employment Act.

(Artuz Decl. Ex. A.) (emphasis added).  The Court finds the Release language sufficiently clear

to communicate effectively the consequences of executing the agreement.  See Cirillo, 862 F.2d

at 452 (finding a release that waived all claims an employee may have against the company "as a

result of . . . termination" to be sufficiently clear and specific).

    The Court recognizes that the Release could have been more specific in terms of which

particular claims Sauter was waiving, but the Release was sufficiently specific to put her on

notice that she was waiving all employment-related claims.  By signing the Release, Sauter

agreed to waive any claim arising out of or relating to her employment, and not just claims she

may have had under the Age Discrimination in Employment Act (ADEA).  While "[t]he absence

6

NOT FOR PUBLICATION

in the Release of any reference to specific claims that are being waived by [the employee] . . .
diminishes its clarity," Riddell v. Med. Inter-Ins. Exchange, 18 F. Supp. 2d 468, 472 (D.N.J.
1998), a waiver provision is not unclear or ambiguous merely because it sweeps broadly. See
Easton v. Bristol-Myers Squibb Co., 289 F. 2d 604, 610 (E.D. Pa. 2003) ("[T]he mere fact that [a
release's] language may be boilerplate, i.e., that it was not specifically drafted with [the
employee's] claims in mind, does not detract from its legal significance.").

Also, an employee's "knowledge of [the] claims can counter any lack of specificity in a
clear waiver of claim provision." Mullen v. New Jersey Steel Corp., 733 F. Supp. 1534 (D.N.J.
1990). In 2005, Sauter witnessed her co-worker, Gina Balsamo, being sexually harassed by
another co-worker, Jim Yuill. (Pl.'s Compl. ¶ 7.) Sauter informed her boss and the FHLBNY's
human resources department that Yuill was treating his female co-workers offensively and
inappropriately. (Pl.'s Compl. ¶¶ 9, 11.) Sauter's awareness of the grievance process within the
employment setting indicates that she knew that by signing the Release, she was foregoing her
right to such process. In addition, while Sauter disputes the fact that Artuz discussed the
contents of the Release with her in their ninety-minute meeting (Pl.'s Br., 9), Sauter nevertheless
had the opportunity to ask Artuz to clarify the Release and to seek counsel's advice on the
matter. This factor weighs in favor of a valid waiver.

2. *Education and Experience*

The Court finds that Sauter had sufficient education and experience to understand and
execute a contractual release. Courts generally view persons with college educations,
professional degrees, business experience, or some combination thereof, as having the requisite

**NOT FOR PUBLICATION**

"education and experience" to understand such a release.  See e.g., Cirillo, 862 F.2d at 453 (finding a "literate, well-educated man" to have the requisite education and experience); Cuchara, 129 F. App'x at 731 ("Although [the plaintiff] is not an attorney, he is an educated professional and there is no evidence that he was unable to comprehend the language of the Release or the implication of waiving his claims.").  Sauter is a college graduate and had worked, at the time she signed the Release, for over eighteen years in the financial services industry, including management positions at Bear Stearns, Chase Manhattan Mortgage, and First American Mortgage.  (Artuz Decl. Ex. B.)  Although Sauter does not have legal experience, she possesses the requisite amount of professional experience to indicate that she can fully understand and execute a contractual release.  She also had the opportunity to consult with an attorney before signing the agreement.  (Artuz Decl. Ex. A.)  This factor weighs in favor of a valid waiver.

   *3.  Time to Deliberate Whether to Sign the Release*

        In the Third Circuit, it is not entirely clear if the "time to deliberate whether to sign the release" is interpreted as the total time provided to a terminated employee or the time that actually lapsed before an employee signed the waiver.  In Coventry, the court analyzed "the amount of time the plaintiff had possession of or access to the agreement before signing it."  856 F.2d at 523 (emphasis added).  In Cirillo, the Third Circuit applied this factor by focusing on the fact that the terminated employee "had" one year to sign the waiver.  See Cirillo, 862 F.2d at 453.  Similarly, in Cuchara, the Court held that an employee "was not rushed into signing the Release" when "[h]e was given twenty-one days" to deliberate.  129 F. App'x at 731 (emphasis added).  This language implies that the Third Circuit interprets this factor as the total

NOT FOR PUBLICATION

consideration time provided, rather than actually taken, by a terminated employee.  Also, it

would not make logical sense for a court to focus on the time that actually lapsed before a

terminated employee signed the waiver rather than the time that an employee was provided.  If

such were the analysis, an opportunistic plaintiff who was provided with ample time would

attempt to use his haste in signing the agreement as a defense to invalidate the waiver.

       Based on this framework, the Court finds that Sauter had enough time to deliberate

whether to sign the Release.  The Third Circuit has found that twenty-one days is sufficient for

an employee to contemplate whether to sign a waiver of claims under Title VII and the ADA.

See Cuchara, 129 F. App'x at 731.  Sauter was provided with twenty-one days to decide whether

to sign the release.  (Pl.'s Br. 16.; Artuz Decl. Ex. A.)  She was additionally given seven days to

revoke her acceptance of the severance package.  (Artuz Decl. Ex. A.)  It is uncontested that the

Release itself clearly states that Sauter may sign and return the agreement by April 11, 2007,

twenty-one days after receipt of the Release.  (Artuz Decl. Ex. A.)  See Cuchara, 129 F. App'x at

730 (holding a twenty-one day period to be sufficient when the Release specifically stated this

time period).  Sauter concedes that she took the letter home and read it before signing the

agreement.  (Sauter Decl. ¶¶ 27-28.)

       While Sauter claims that she was in possession of the agreement for only four hours

before signing it and sending it back to the FHLBNY, she was nonetheless afforded three weeks

in which to deliberate signing the Release.  (Id.)  In addition, although Sauter may have believed

that she needed to sign the Release right away in order to ensure the uninterrupted continuation

of her health benefits, this misunderstanding was not based on any positive statements made by

Artuz.  The Third Circuit has held that "a misguided subjective belief, without more, is

9

**NOT FOR PUBLICATION**

insufficient to defeat summary judgment in the face of [a release's] clear and unambiguous

language." See Cirillo, 862 F.2d at 452.  In this case, she could have elected to continue medical

coverage under COBRA, by paying the premiums herself, rather than rushing to sign the waiver.

(Artuz Decl. Ex. A.)  This factor weighs in favor of a valid waiver.

       4.  *Whether Sauter Knew or Should Have Known Her Rights*

      "A release is more likely to be knowing and voluntary if the employee understood the

rights being waived."  Riddell, 18 F. Supp. 2d at 473.  Sauter argues in her brief that she did not

consult with an attorney before signing the Release and was wholly unaware of her rights to

bring suit against the FHLBNY under Title VII and the ADA.  (Pl.'s Br., 17.)  The Court has not

been provided with any contrary evidence to demonstrate that she was informed of her rights,

such as through an employee handbook or during her ninety-minute discussion with Artuz.  Cf.

Mullen, 733 F. Spp. at 1544 (holding that the plaintiff knew or should have known his rights

when the employer displayed ADEA notices at the job-site and provided a handbook detailing

anti-discrimination policies); Cirillo, 863 F.3d at 453 (ruling that plaintiff's testimony stating

that he signed the release because he did not think he could win a discrimination suit proved that

he clearly knew his rights); Dougherty v. Teva Pharm. USA, 2008 U.S. Dist. LEXIS 13255, at *

20-21 (E.D.Pa. February 21, 2008) (holding that this factor weighed in favor of finding the

release to have been executed knowingly and voluntarily when it was undisputed that the

terminated employee believed she had a discrimination claim against her employer).


      Moreover, the Release itself did not explain which rights Sauter had under the law, with

the exception of her rights under the ADEA.  (Artuz Decl. Ex. A.)  See Mullen, 18 F. Supp. 2d at

NOT FOR PUBLICATION

473; see also Cirillo, 862 F.2d at 453 (holding a waiver to be voluntarily and knowingly

executed when the notice provision in the release explained the rights being released).  This

factor weighs in favor of finding that the Release was invalid.

     *5.  Opportunity to Seek Counsel*

     To determine whether a plaintiff executed a knowing and voluntary waiver, the Third

Circuit focuses on "whether consultation with a lawyer was encouraged . . . rather than whether

the plaintiff in fact received the benefit of counsel."  See Cirillo, 862 F.2d at 454.  "[I]t should

normally suffice for the employer to suggest that the employee may wish to consult an attorney."

Id.  In Cuchara, the Third Circuit held that the plaintiff had a meaningful opportunity to seek

counsel because he "not only had the opportunity to obtain counsel," but he was "twice explicitly

advised . . . to hire an attorney."  See 129 F. App'x at 731; cf. Coventry, 856 F.2d at 524.

     Sauter first argues that Artuz did not advise her to consult an attorney to review the

Release before she signed it.  (Sauter Decl. ¶ 32.)  However, the suggestion that an employee

consult with attorney can be made "either verbally or in writing."  See Cirillo, 862 F.2d at 454.

In this case, the Release stated, "[y]ou may wish to consult an attorney before signing the

agreement."  (Artuz Decl. Ex. A.)  While the Release admittedly did not contain an explicit

direction for Sauter to hire an attorney, as would have been the case with the use of the word

"should," it certainly qualifies as a suggestion that consultation with legal counsel might be

appropriate.  Similarly, the language alerts the reader that speaking with an attorney before

executing the agreement could be in that person's best interest.  Sauter had a meaningful

opportunity to seek counsel regarding the waiver, such that her execution of the agreement was

made knowingly and voluntarily.  This factor weighs in favor of a valid waiver.

NOT FOR PUBLICATION

  *6. Opportunity to Negotiate the Terms of the Release*

  The ability to negotiate the terms of a release suggests that the atmosphere surrounding its execution was not oppressive and thus indicates a voluntary waiver.  See Riddell, 18 F. Supp. 2d at 473-74 ("[T]he existence of an opportunity to negotiate with respect to a release is a substantial indicia that its execution was voluntary." (quoting Cirillo, 862 F.2d at 454 n.4)).  "While the absence of such an opportunity is not as strong an indicia that a release [was executed] unknowing[ly] or involuntar[ily], to the extent such absence and other evidence suggest that the atmosphere surrounding the execution was oppressive, it is of course, a relevant consideration."  Cirillo, 862 F.2d at 454 n.4.  The critical consideration, then, is "whether the employee had an opportunity to negotiate the terms of a release, not whether she actually took advantage of that opportunity."  See Dougherty, 2008 U.S. Dist. LEXIS 13255, at *22-23. But see Coventry, 856 F.2d at 523 (analyzing "the [actual] role of [the] plaintiff in deciding the terms of the agreement").

  Here, Sauter was given twenty-one days in which to decide whether to sign the Release. (Pl.'s Br. 16.; Artuz Decl. Ex. A.)  During this time period, she could have consulted with legal counsel and decided to negotiate the terms of the Release with her former employer.  The fact that she chose not to take advantage of this opportunity does not suggest that the atmosphere surrounding the execution of this agreement was oppressive; on the contrary, Sauter met with Artuz for ninety minutes to discuss the terms of her termination, was given twenty-one days in which to consider signing the Release, and was provided with seven more days in which she could have revoked her acceptance.  (Artuz Decl, Ex. A.)  Contra Riddell, 18 F. Supp. 2d at 474 (finding that when an employee "was given only 3-5 minutes to review" the document, the

NOT FOR PUBLICATION

release was not executed knowingly and voluntarily).  Also, nothing in Sauter's agreement indicated that she was prohibited from negotiating the terms of the Release with her former employer; rather, on the signature page, the agreement states that if Sauter has "any questions or otherwise wish[es] to discuss this matter," she should feel free to contact Artuz.  (Id.)  This factor weighs in favor of a valid waiver.

       *7.  The Consideration in Return for the Waiver*

       The Release Sauter signed was supported by valid consideration in the form of severance payments.  "If the waiver is unsupported by consideration, then it is not enforceable."  Riddell, 18 F.Supp.2d at 474 (citing Cirillo, 862 F.2d at 454).  In Westak v. Lehigh Valley Health Network, the Third Circuit held that the monetary severance paid to the terminated employee was "substantial and certainly 'in addition' to what" the employee "was entitled to upon his termination - nothing."  342 F.3d 281, 294 (3d Cir. 2003).  The court therefore recognized that the severance benefits Westak received constituted adequate consideration, validating the waiver agreement.  Id.  Similarly, in Cirillo, the Third Circuit held that the "special allowance given to Cirillo and accepted by him in exchange for his Release exceeded the employee benefits to which he was already entitled," and therefore found that the terminated employee's waiver was supported by adequate consideration.  Cirillo, 862 F.2d at454.

       Likewise, in exchange for Sauter signing the Release, she received four weeks of severance pay of $5,465.64 and reimbursement of $669.15 for the premium associated with one month of continuation of health insurance under COBRA.  (Artuz Supplemental Decl. ¶¶ 5-7; Artuz Decl. Ex. A.)  There is a dispute of fact as to whether Sauter actually received a copy of the "Severance Pay Plan," detailing the monetary value of her severance package.  (Pl.'s Br., 18-

**NOT FOR PUBLICATION**

19.)  However, it is uncontested that Sauter received the four weeks of severance payment as well as a COBRA-related reimbursement.  Because Sauter was entitled to "nothing," the monetary benefits she received as part of her severance package constitutes adequate consideration.  This factor weighs in favor of a valid waiver.

Six of the seven factors considered by the Third Circuit to determine the validity of a waiver weigh heavily in favor of finding a valid waiver:  The Release's language was clear and specific; Sauter had sufficient education and experience to understand the nature of the Release; Sauter had sufficient time to deliberate whether to sign the Release; Sauter had the opportunity, but voluntarily refused, to seek legal counsel; Sauter likewise had the opportunity, but chose not, to negotiate the terms of the Release; and the Release was supported by consideration.  The one factor weighing against, knowledge of her specific rights, is outweighed by these other factors. The qualitative totality of the relevant circumstances determines that Sauter voluntarily and knowingly signed the Release.

**B.  Whether the Release is Void because it was Signed under Duress**

Sauter further argues that the Release is unenforceable because it was signed under duress.  (Pl.'s Br., 25.)  Under New Jersey law, "[a] party alleging economic distress must show that he has been the victim of a wrongful or illegal act or threat" that "deprive[d] the victim of his unfettered will."  See Campbell Soup Co. v. Desatnick, 58 F.Supp. 2d 477, 492 (D.N.J. 1999) (quoting Cont'l Bank v. Barclay Riding Acad., Inc., 93 N.J. 153, 176, 459 A.2d 1163, 1175 (1983)).  The "decisive factor" in determining whether a contract has been signed under economic duress is the "wrongfulness of the pressure exerted."  See id. (citing Cont'l Bank, 93 N.J. at 177, 459 A.2d at 1175).  "Merely taking advantage of another's financial difficulty,"

14

NOT FOR PUBLICATION

however, "is not duress."  28 Richard A. Lord, <u>Williston on Contracts</u> § 71.43 (Thomson Reuters/West 4th ed. 2009) (1920).  "[E]conomic pressure alone is insufficient to establish a claim of duress that would void an otherwise valid release."  <u>Cirillo</u>, 862 F.2d at 452 (quoting <u>Three Rivers Motor Co. v. Ford Motor Co.</u>, 522 F.2d 885 (3d Cir. 1975)); <u>see</u> <u>also</u> <u>Knoll v. Equinox Fitness Clubs</u>, 2003 WL 23018807, at *8 (S.D.N.Y. Dec. 22, 2003) ("[A] sophisticated party seeking to void a contract because of economic duress must do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations." (citation omitted)).

In <u>Cirillo</u>, a terminated employee signed a waiver of rights under the ADEA in exchange for an enhanced retirement package and special payment allowance.  <u>See</u> <u>Cirillo</u>, 862 F.2d at 449.  When Cirillo attempted to sue his former employer for violations under the ADEA, the employer moved for summary judgment on the ground that, by signing the agreement, Cirillo waived any ADEA claim arising from his termination.  <u>See</u> <u>id.</u> at 450-51.  The Third Circuit affirmed the summary judgment in the employer's favor because "[a]lthough Cirillo certainly faced economic pressure in the sense that he was offered an economic incentive to release any claims he might have, it was neither of the degree nor kind of pressure affecting the voluntariness of the waiver."  <u>Id.</u> at 452.

In this case, Sauter claims that she had no choice but to sign the Release because the termination letter she received from the FHLBNY stated that her health benefits were to be terminated as of March 20, 2007, only one day before her pre-approved FMLA leave was to commence and only one week before she was scheduled to have a life-threatening embellization. (Pl.'s Br., 25; <u>see</u> <u>also</u> Sauter Decl. ¶¶ 26, 31.)  She further alleges that she "desperately needed .

15

NOT FOR PUBLICATION

. . medical insurance benefits because they were the only way . . . [she] could afford the . . .

procedure that could potentially save . . . [her] life." (Sauter Decl. ¶ 29.)  Moreover, Sauter

claims that the FHLBNY intentionally deprived her of her free will in deciding whether to sign

the Release since the FHLBNY took advantage of its knowledge of the precise day on which she

was most in need of her medical benefits and most likely to sign the Release.  (Pl.'s Br., 25.)

Sauter, however, does not present any facts suggesting that she was unable to pay her COBRA

benefits herself; in fact, when she arrived at the hospital on March 21, 2007, she was able to pay

the $1500 deposit toward the cost of medical services (Sauter Decl. ¶ 38).  Sauter's argument

rests on her mistaken assumption that by signing the Release, her benefits would be instantly

reinstated.  No such language exists in the Release and plaintiff does not argue that any of

defendant's representatives suggested this consequential relationship between signing the

Release and the reinstatement of medical benefits.  Although Sauter faced economic pressure in

the sense that she was offered the economic incentive of healthcare coverage in exchange for

releasing any claims she might have, this pressure did not affect the voluntariness of the waiver,

and therefore does not constitute economic duress.

From the facts alleged, it also appears that Sauter claims to have signed the Release under

emotional duress.  (Pl.'s Br., 25.)  She contends that the FHLBNY purposely waited to terminate

her employment and present her with the Release until the day before her FMLA-approved

leave, in order to take advantage of her emotional vulnerability.  (Id.)  Sauter further alleges that

her "mind was racing with stress" and that she felt "absolutely terrified at the thought that [her] .

. . medical benefits would be cancelled." (Sauter Decl. ¶27.)  She therefore "panicked" and

rushed to sign and return the Release.  (Id. ¶ 30.)  "[T]he rule followed by . . . [the Third Circuit]

NOT FOR PUBLICATION

is that 'one asserting duress must establish a wrongful act or threat which prevented a party from exercising his free will and judgment.'" Cirillo, 862 F.2d at 452 (quoting Plechner v. Widener College, Inc., 569 F.2d 1250, 1261 (3d Cir. 1977)).  In Westak, a terminated employee claimed that at the time he signed a waiver of rights under numerous federal statutes, he was suffering from "psychological trauma" due to his termination and its accompanying financial consequences.  342 F.3d at 294.  He further asserted that upon termination, he faced the prospect of serious financial pressures that ultimately caused him to suffer severe depression and anxiety. Id. at 295.  In that case, the Third Circuit validated the waiver because there was "no evidence in the record to support the claim that he was experiencing mental impairments when he signed the Release" and because the "law is clear that the existence of financial pressure to sign a waiver is insufficient to establish that it was executed involuntarily."  Id.  Similarly, Sauter's emotional duress claim fails because she does not point to a wrongful act or threat on the part of the FHLBNY that placed her in an emotional state such that she was prevented from exercising her free will and judgment.  In addition, while it is clear that she was emotionally stressed on the day of her termination due to her upcoming health procedure, there is nothing in the record that indicates that she could not have taken the full twenty-one days allowed to consider the Release and made her decision after recovering from the stress of her pending medical procedure.

Finally, Sauter did not sign the Release under either economic or emotional duress because there was adequacy of consideration in the contract between Sauter and the FHLBNY. "Where there is adequacy of consideration, there is generally no duress."  28 Richard A. Lord, Williston on Contracts § 71.43 (Thomson Reuters/West 4th ed. 2009) (1920); see also Campbell, 58 F.Supp. 2d at 492 (citing Cont'l Bank, 93 N.J. at 175-76, 459 A.2d at 1175).  As explained

NOT FOR PUBLICATION

earlier, the four weeks of severance pay of $5,465.64 and reimbursement of $669.15 for the

premium associated with one month of continuation of health insurance under COBRA

constitute adequate consideration.  Her duress defense is therefore precluded.[1]

**C.  Whether the Release is Invalid Because FMLA Claims Cannot Be Waived**

Plaintiff argues that the her waiver of FMLA claims under the Release is invalid because

it is contrary to the language of 29 C.F.R. § 825.220(d) which reads:

> § 825.220 How are employees protected who request leave or otherwise assert FMLA rights?
> . . .
> (d) Employees cannot waive, nor may employers induce employees to waive, their rights under FMLA.  For example, employees (or their collective bargaining representatives) cannot "trade off" the right to take FMLA leave against some other benefit offered by the employer. This does not prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a "light duty" assignment while recovering from a serious health condition (see § 825.702(d)).  In such a circumstance the employee's right to restoration to the same or an equivalent position is available until 12 weeks have passed within the 12-month period, including all FMLA leave taken and the period of "light duty."

There currently exists a split between the Circuits as to whether 825.220(d)'s prohibition on the

waiver of "rights under the FMLA" makes waivers of prior claims under the FMLA invalid as a

matter of law.  In Taylor v. Progress Energy, Inc., the Fourth Circuit interpreted 29 C.F.R. §

825.220(d) to require court approval of any release of FMLA claims.  493 F.3d 454, 463 (4th

Cir. 2007).  The Court in Taylor rejected the Department of Labor's position that 825.220(d)

allowed the waiver of prior claims but not future rights.  See id. at 456-59.  By contrast, the

position of the Department of Labor was adopted by Fifth Circuit in Faris v. Williams WPC-I,

Inc., 332 F.3d 316 (5th Cir. 2003) and, more recently, the Eastern District of Pennsylvania in

---

[1] Since the Court finds plaintiff's duress argument unpersuasive, there is no need to consider the doctrine of ratification raised by defendant.  (Def.'s Reply Br., 23.)

NOT FOR PUBLICATION

Dougherty v. Teva Pharmaceuticals USA, Inc., 2007 U.S. Dist. LEXIS 27200 (E.D.Pa. April 9, 2007).

       The Court finds the decision of the Fifth Circuit and the Eastern District of Pennsylvania to be particularly persuasive since they give proper deference to the Department of Labor's interpretation of its own regulation.  See Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997) (an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation."); see also Christensen v. Harris County, 529 U.S. 576, 588, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) ("Auer deference is warranted . . . when the language of the regulation is ambiguous.").  The waiver of FMLA claims under the Release is not invalid under 825.220(d) since the waiver was limited only to prior claims and did not seek to have plaintiff waive her future FMLA rights.

CONCLUSION

       The Court finds that plaintiff knowingly and voluntarily executed a valid release.  The Release plaintiff signed was clear and specific and supported by valid consideration.  Plaintiff had sufficient education and experience to understand and execute the waiver.  Plaintiff had sufficient time to deliberate whether to sign the Release.  She also had the opportunity to seek legal counsel and  negotiate the terms of the Release; she chose not to do so.  The Release was not executed under either economic or emotional duress, since stress caused by plaintiff's misunderstanding of facts does not constitute duress.  And finally, FMLA claims are, in fact, waivable.

**NOT FOR PUBLICATION**

The Court grants defendant's motion for summary judgment.  Plaintiff's cross-motion for partial summary judgment is denied.  Plaintiff's claims are dismissed with prejudice.


                                                      s/William H. Walls
                                                      United States Senior District Judge


**Appearances:**

Sarah Fern Meil
19 Bridge Street
P.O. Box 426
Stockton, NJ 08559
           Attorney for Plaintiff Kim L. Sauter

Aliza F. Herzberg (*pro hac vice*) (AH-1120)
Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, NY 10022
        -and-
John E. MacDonald
Stark & Stark, P.C.
P.O. Box 5315
Princeton, NJ 08543
           Attorneys for Defendant Federal Home Loan Bank of New York